1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   LISA D.,[1]                              Case No.:  22cv695-DMS(MSB)

12                            Plaintiff,
                                              **REPORT AND RECOMMENDATION**
13   v.                                       **REGARDING JOINT MOTION FOR**
                                              **JUDICIAL REVIEW [ECF NO. 19]**
14   KILOLO KIJAKAZI, Acting Commissioner of
     Social Security,[2]
15
                             Defendant.
16

17

18        This Report and Recommendation is submitted to the Honorable Dana M. Sabraw,

19   United States District Chief Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule

20   72.1(c) of the United States District Court for the Southern District of California.  On May

21   16, 2022, Plaintiff Lisa D. filed a Complaint pursuant to 42 U.S.C. §§ 405(g) and

22   1383(c)(3), seeking judicial review of a decision by the Commissioner of Social Security

23   ("Commissioner") denying her application for disability insurance benefits and

24   supplemental security income.  (See Compl., ECF No. 1.)

25

26   _____

27   [1] Under Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42 U.S.C. § 405(g)] will refer to any non-government parties by using only their first name and last initial."

28   [2] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration. See https://www.ssa.gov/agency/commissioner.html (last visited on August 25, 2023).

1    Now pending before the Court is the parties' "Joint Motion for Judicial Review of

2    the Final Decision of the Acting Commissioner of Social Security" ("Joint Motion").  (ECF

3    No. 19 ("J. Mot.").)  The Court has carefully reviewed the parties' Joint Motion and the

4    Administrative Record ("AR") [ECF No. 10], and for the reasons set forth below,

5    **RECOMMENDS** that the Commissioner's decision be **REVERSED** and this matter be

6    **REMANDED** for further administrative proceedings consistent with this Report and

7    Recommendation.

8    I.    PROCEDURAL BACKGROUND

9    On September 6, 2019, Plaintiff filed applications for disability insurance benefits

10   and supplemental security income under Titles II and XVI of the Social Security Act,

11   alleging disability beginning on March 23, 2018.  (AR 274–89.)[3]  Her applications were

12   denied initially on February 26, 2020, and upon reconsideration on July 13, 2020.  (AR

13   155–56, 187–88).  On August 27, 2020, Plaintiff requested a hearing before an

14   administrative law judge ("ALJ").  (AR 208.)  On June 4, 2021, ALJ Kevin Messer held a

15   telephonic administrative hearing, during which Plaintiff was represented by counsel.

16   (AR 35–63.)  Both Plaintiff and an impartial vocational expert, Shirley Ripp, testified.

17   (Id.)  In a written decision dated June 25, 2021, the ALJ denied Plaintiff's application,

18   concluding that Plaintiff had not been under a disability from March 23, 2018, through

19   the date of the decision.  (AR 12–34.)

20   On August 31, 2021, the Appeals Council received a request for review of the

21   ALJ's decision.  (AR 7–11.)  The Appeals Council denied the request on March 14, 2022,

22   resulting in the ALJ's decision becoming the final decision of the Commissioner.  (AR 1–

23   6.)  On May 16, 2022, Plaintiff filed the instant civil action.  (ECF No. 1.)  Pursuant to the

24

25   ───────────────

26   [3] Plaintiff previously applied for disability insurance benefits and social security income, which an ALJ
     denied on March 22, 2018.  (AR 15, 90–116.)  The Appeals Council subsequently denied review on
     February 2, 2019.  (AR 15, 117–122.)  In the instant case, the ALJ found that the "presumption of

27   nondisability is rebutted by the additional medical evidence submitted since the previous decision."
     (AR 15.)  Accordingly, he did not adopt the findings of the March 22, 2018 decision with respect to

28   Plaintiff's residual functional capacity ("RFC").  (Id.)

1   Court's briefing schedule, the parties timely filed their Joint Motion for Judicial Review

2   on March 2, 2023.  (ECF No. 19.)

3   **II.    SUMMARY OF THE ALJ'S FINDINGS**

4          In rendering his decision, the ALJ followed the Commissioner's five-step

5   sequential evaluation process.  See 20 C.F.R. § 404.1520.  At step one, the ALJ found

6   Plaintiff had not engaged in substantial gainful activity since March 23, 2018, the alleged

7   onset date.  (AR 18.)  At step two, the ALJ found Plaintiff had the following severe

8   impairments that significantly limit her ability to perform basic work activities:

9          lupus, ulcerative colitis, peripheral neuropathy, degenerative disc disease of
          the cervical spine, fibromyalgia, rheumatoid arthritis, chronic pain
10         syndrome, adhesive capsulitis of left shoulder, depression, generalized
          anxiety disorder, and attention deficit hyperactive disorder.
11

12  (Id.)  The ALJ also noted Plaintiff's alleged impairments of "obesity, TMJ disorder, fatty

13  liver, chondromalacia patella of left knee, degenerative joint disease of right foot, and

14  Bells' [sic] palsy," but found they were non-severe because they "have not resulted in

15  any significant limitation in [her] ability to do basic work activities."  (AR 18–19.)

16         At step three, the ALJ found Plaintiff did not have an impairment or combination

17  of impairments that met or medically equaled the severity of one of the impairments

18  listed in the Commissioner's Listing of Impairments.  (AR 19.)  Specifically, the ALJ

19  considered the following listed impairments: 1.15 disorders of the skeletal spine

20  resulting in compromise of a nerve root(s); 1.16 lumbar spinal stenosis resulting in

21  compromise of the cauda equina; 1.18 abnormality of a major joint(s) in any extremity;

22  and 5.05 chronic liver disease.  (Id.; 20 C.F.R. pt. 404, app. 1.)  The ALJ also determined

23  that Plaintiff's mental impairments, considered individually and together, did not meet

24  the criteria of listings 12.04 depressive, bipolar and related disorders; and 12.06 anxiety

25  and obsessive-compulsive disorders.  (AR 20; 20 C.F.R. pt. 404, Part 404, Subpart P,

26  Appendix 1.)

27         Based on his evaluation of the medical and opinion evidence in the record, the

28  ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform

sedentary work, subject to the following limitations:

> [Plaintiff] has the residual functional capacity to perform sedentary work . . . except she is unable to climb ladders, ropes or scaffolds.  She is unable to crawl.  She is able to occasionally climb ramps and stairs.  She is able to occasionally balance, stoop, kneel and crouch.  She is able to frequently reach overhead with bilateral upper extremities.  She must avoid concentrated exposure to fumes, odors, gases and other pulmonary irritants.  She is able to understand, remember, and carry out simple, routine tasks.  She is able to have occasional interaction with the general public and only occasional work-related, non-personal, non-social interaction with co-workers and supervisors.  She is limited to jobs requiring only simple work-related decisions.  However, she is able to keep pace sufficient to complete tasks and meet quotas typically found in unskilled work.

(AR 21–22.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (AR 22.)  However, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Id.)  The ALJ said "[t]he longitudinal record does not support a finding that claimant's impairments are so severe as to be disabling," emphasizing that her "symptoms are stable" and she "received only minimal, conservative treatment."  (Id.)  Based on the foregoing, the ALJ concluded a sedentary exertional level was appropriate, emphasizing that "the objective medical evidence . . . establishes that the claimant has a greater sustained capacity than the claimant alleges."  (AR 27.)

At step four, the ALJ found that Plaintiff is unable to perform her past relevant work as an automobile salesperson.  (AR 27.)  Finally, the ALJ proceeded to step five of the sequential evaluation process.  The ALJ noted the vocational expert's testimony that a hypothetical individual with Plaintiff's vocational profile and RFC could perform the requirements of other occupations that exist in significant numbers in the national economy, such as document preparer, addressing clerk, and escort vehicle driver.  (AR

1   28.)  These occupations require the ability to perform sedentary, unskilled work.  (Id.)

2   Thus, the ALJ concluded Plaintiff had not been under a disability as defined by the Social

3   Security Act from March 23, 2018, through the date of the decision, and denied her

4   applications for disability insurance benefits and supplemental security income.  (AR 29.)

### III.   DISPUTED ISSUES

6   The parties have briefed five issues in their Joint Motion, which Plaintiff asserts

7   are grounds for reversal:

1. Whether the ALJ provided specific, clear, and convincing reasons for discounting Plaintiff's allegations of pain and physical dysfunction.
2. Whether the ALJ failed to develop the medical opinion evidence regarding Plaintiff's physical limitations and instead served as his own medical expert.
3. Whether the ALJ formulated a residual functional capacity that reasonably accommodated Plaintiff's ulcerative colitis.
4. Whether the ALJ erroneously departed from the opinion of the State agency psychiatrist without explanation.
5. Whether Plaintiff could perform a significant number of jobs in the national economy.

16   (J. Mot. at 2.)

### IV.  STANDARD OF REVIEW

18   Section 405(g) of the Social Security Act allows unsuccessful applicants to seek

19   judicial review of the Commissioner's final decision.  See 42 U.S.C. § 405(g).  The scope

20   of judicial review is limited, and the denial of benefits will only be disturbed if it is not

21   supported by substantial evidence or contains a legal error.  Luther v. Berryhill, 891 F.3d

22   872, 875 (9th Cir. 2018).  "Substantial evidence" is a "'term of art' used throughout

23   administrative law to describe how courts are to review agency factfinding."  Biestek v.

24   Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting T-Mobile South, LLC v. Roswell, 135 S. Ct.

25   808, 815 (2015)).  The Supreme Court has said substantial evidence means "more than a

26   mere scintilla," but only "such relevant evidence as a reasonable mind might accept as

27   adequate to support a conclusion."  Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S.

28   197, 229 (1938)).  The Ninth Circuit explains that substantial evidence is "more than a

1   mere scintilla but less than a preponderance." Revels v. Berryhill, 874 F.3d 648, 654 (9th

2   Cir. 2017) (quoting Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th

3   Cir. 1988).

4          Where the evidence is susceptible to more than one rational interpretation, the

5   ALJ's decision must be upheld.  See Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir.

6   2008).  This includes deferring to the ALJ's credibility determinations and resolutions of

7   evidentiary conflicts.  See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Even if the

8   reviewing court finds that substantial evidence supports the ALJ's conclusions, the court

9   must set aside the decision if the ALJ failed to apply the proper legal standards in

10  weighing the evidence and reaching his or her decision.  See Batson v. Comm'r Soc. Sec.

11  Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).  The reviewing court may enter a

12  "judgment affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. §

13  405(g).  The reviewing court may also remand the case to the Social Security

14  Administration for further proceedings.  Id.  However, the reviewing court "may not

15  reverse an ALJ's decision on account of an error that is harmless."  Molina v. Astrue, 674

16  F.3d 1104, 1111 (9th Cir. 2012).

**V.  DISCUSSION**

**A.    Whether the ALJ Provided Specific, Clear, and Convincing Reasons for**
**       Discounting Plaintiff's Allegations of Pain and Physical Dysfunction**

**        1.    Summary of the parties' arguments**

21          Plaintiff argues the ALJ "failed to provide specific, clear, and convincing reasons

22  for discounting Plaintiff's allegations of pain and physical dysfunction."  (J. Mot. at 4–

23  12.)  First, she contends that the ALJ did not cite to any specific medical evidence

24  supporting the conclusion that Plaintiff's symptoms were "stable."  (Id. at 7–8.)  By

25  contrast, Plaintiff says the record evidence demonstrated that her pain was

26  "progressively worsening."  (Id. at 8.)  Additionally, even if Plaintiff's medical conditions

27  were "stable," she argues they "stabilized at a disabling level of severity" and the ALJ did

28  not explain "how the plateauing of Plaintiff's symptoms undermined her allegations of

1   pain and physical dysfunction." (Id.)  Second, Plaintiff contends the ALJ wrongly

2   concluded that attempts to control her symptoms—including chiropractic adjustments,

3   narcotic pain medication, trigger point injections, and epidural steroid injections—were

4   "minimal or conservative." (Id. at 8–10.)  Plaintiff cites to Ninth Circuit case law holding

5   that treatment with narcotics, pain medication, and injections is not "conservative." (Id.

6   at 9–10.)  Further, Plaintiff contends medication was the "most aggressive modality" to

7   treat certain impairments like lupus and fibromyalgia. (Id. at 10.)  Although Plaintiff

8   acknowledges that the ALJ summarized the medical evidence, she says the summary

9   was "selective" and over-emphasized certain examination results. (Id. at 11.)  She

10  argues that the fact that she had a normal gait, balance, and motor strength was not a

11  "clear or convincing" reason to discount her pain. (Id. at 11–12.)

12        In response, the Commissioner argues the ALJ's findings are supported by

13  substantial evidence and should be upheld. (Id. at 13–18.)  The Commissioner says the

14  ALJ properly summarized Plaintiff's subjective complaints and concluded that "[t]he

15  longitudinal record did not support a finding that her impairments were so severe as to

16  be disabling." (Id. at 13.)  First, the record demonstrated Plaintiff's symptoms were

17  "stable" and inconsistent with her complaints of pain and debilitating mental symptoms.

18  (Id. at 13–14.)  For example, physical examinations revealed Plaintiff's gait and balance

19  were normal, while mental examinations showed Plaintiff was "alert and oriented,"

20  "calm and cooperative," and had "good insight, judgment, and impulse control." (Id. at

21  14.)  Second, the Commissioner contends the ALJ appropriately pointed out Plaintiff's

22  "conservative treatment," including physical therapy, self-exercise, and chiropractic

23  manipulative therapy. (Id. at 15–16.)  The ALJ acknowledged Plaintiff was prescribed

24  narcotic pain medication and injections; however, "these were largely effective and

25  were used in conjunction with the aforementioned conservative modalities." (Id. at 16.)

26  Finally, the Commissioner maintains that Plaintiff's admitted activities—including taking

27  care of her two dogs, driving, riding a bicycle, preparing meals, and doing yoga—

28  contradicted her complaints of disabling pain. (Id. at 17.)  Thus, the Commissioner

1   argues the inconsistencies between Plaintiff's subjective complaints and the record

2   evidence were sufficient to undercut her subjective pain allegations.  (Id. at 18.)

3       **2.    Applicable law**

4       When evaluating the credibility of a claimant's allegations regarding subjective

5   symptoms such as pain, the ALJ must engage in a two-step analysis.  See Johnson v.

6   Kijakazi, No. 19-17359, 2022 WL 1553259, at *1 (9th Cir. May 17, 2022); Vasquez v.

7   Astrue, 572 F.3d 586, 591 (9th Cir. 2009); Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36

8   (9th Cir. 2007).  First, the ALJ must determine whether there is objective medical

9   evidence of an underlying impairment that "could reasonably be expected to produce

10  the pain or other symptoms alleged."  Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir.

11  2017) (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  The claimant

12  is not required to show that an underlying impairment could reasonably be expected to

13  cause the severity of the pain alleged, but only that it could have reasonably caused

14  some degree of pain.  Vasquez, 572 F.3d at 591 (citing Lingenfelter, 504 F.3d at 1036).

15      Second, if the claimant meets the first step and there is no evidence of

16  malingering, then the ALJ may reject the claimant's statements about the severity of his

17  symptoms "only by offering specific, clear and convincing reasons for doing so."

18  Trevizo, 871 F.3d at 678 (quoting Garrison, 759 F.3d at 1014–15).  "The clear and

19  convincing standard is the most demanding required in Social Security cases."  Revels,

20  874 F.3d at 655 (quoting Garrison, 759 F.3d at 1014–15).  General findings are

21  insufficient, and the ALJ must identify which specific pain and symptom statements are

22  being discounted and what evidence undermines those claims.  See Lambert v. Saul, 980

23  F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler v. Comm'r Soc. Sec. Admin., 775 F.3d

24  1090, 1102 (9th Cir. 2014); Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).  An ALJ's

25  failure to identify specific statements and explain why they are not credible constitutes

26  reversible error because the reviewing court cannot determine if the ALJ's decision was

27  supported by substantial evidence.  See Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th

28  Cir. 2015); see also SSR 16-3p.

1      "[B]ecause symptoms, such as pain, are subjective and difficult to quantify," the

2      ALJ considers "all of the evidence presented," including information about the

3      claimant's prior work record, statements about their symptoms, evidence submitted by

4      their medical sources, and observations by the Agency's employees and other persons.

5      20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.  Factors the ALJ may consider, in

6      addition to objective medical evidence, include Plaintiff's daily activities; the location,

7      duration, frequency, and intensity of their pain or other symptoms; precipitating and

8      aggravating factors; the type, dosage, effectiveness, and side effects of any medication

9      taken to alleviate pain; treatment; and any other measures used to relieve pain.  <u>See</u> 20

10     C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.  The ALJ may also consider

11     inconsistencies between Plaintiff's statements regarding pain and the medical evidence.

12     <u>See</u> 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 16-3p.

13     **3.  Plaintiff's testimony**

14         In a function report date October 8, 2019, Plaintiff wrote that her conditions

15     affect the following activities: lifting, squatting, bending, standing, reaching, walking,

16     sitting, kneeling, talking, stair-climbing, memory, completing tasks, concentration,

17     understanding, and following instructions.  (AR 337.)  Plaintiff added, "I live with pain

18     daily it affects all the above."  (<u>Id.</u>)  She said she does not handle stress well, citing her

19     "hypertension [sic] and IBD [irritable bowel disease]." (AR 338.)  Further, Plaintiff said

20     she experiences "uncontrollable crying and anxiety" and sleeps with braces on her arms

21     at night.  (<u>Id.</u>)  Plaintiff reported taking Gabapentin and experiencing side effects of

22     grogginess and forgetfulness.  (AR 339.)

23         During the administrative hearing on June 4, 2021, Plaintiff testified that she was

24     diagnosed with lupus and fibromyalgia in January 2019.  (AR 44.)  She explained that her

25     "joints are incredibly stiff, achy, and sore," and said she "feel[s] like the Tin Woman."

26     (AR 45.)  Additionally, Plaintiff said she experiences pain and discomfort in both

27     shoulders when attempting to perform certain movements with her arms.  (AR 45–46.)

28     Plaintiff testified that she had "sharp, achy, very stiff" neck pain despite two prior

epidural steroid injections and discussed implantation of a spinal cord simulator with her doctor.  (AR 46–47.)  She said the pain is worse in her ankles, knees, and hands.  (AR 47.)  Due to pain, Plaintiff alleged she was limited to sitting for twenty to twenty-five minutes at a time, standing for ten minutes at a time, and lifting ten pounds.  (AR 51.)  Plaintiff also said she took hydrocodone for pain three times a day.  (AR 52–53.)

### 4. The ALJ's findings

The ALJ began his credibility analysis by summarizing Plaintiff's testimony in a single paragraph:

> The claimant is a 48-year-old [woman] who alleges disability due to lupus, ulcerative colitis, peripheral neuropathy, degenerative disc disease of the cervical spine, fibromyalgia, rheumatoid arthritis, chronic pain syndrome, adhesive capsulitis of left shoulder, depression, generalized anxiety disorder, and ADHD.  She alleges that she stopped working in June 2013 due to her alleged conditions.  She alleges difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair-climbing, memory, completing tasks, concentration, understanding and following instructions.

(AR 22.)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Id.)  However, the ALJ challenged the severity of Plaintiff's symptoms:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> The longitudinal record does not support a finding that the claimant's impairments are so severe as to be disabling.  The record reveals that the claimant's symptoms are stable.  The record also reveals that the claimant received only minimal, conservative treatment for her allegedly disabling impairments, and did not require emergency room or hospital treatment or extensive evaluation or testing during the period she claimed disability.

(Id.)

The ALJ then summarized various treatment notes (AR 22–26), noting inconsistencies between Plaintiff's complaints and the medical evidence:

22cv695-DMS (MSB)

- <u>Lupus, fibromyalgia, and rheumatoid arthritis</u>:  Plaintiff started on medication for these conditions in March 2019.  (AR 647–48.)  In April 2019, Plaintiff complained of multiple joint pain, stiffness, and more; however, she also reported that "gabapentin is helping."  (AR 444, 599.)  In August 2019, Plaintiff continued to have whole-body pain but reported "decreased rashes" and "[n]o oral ulcers."  (AR 489, 755.)  Between February 2020 and November 2020, Plaintiff had no swelling but persistent stiffness; she had no synovitis and full range of motion in most joints.  (AR 758–775.)  Between January 2021 and May 2021, Plaintiff reported much of the same and was "feel[ing] better with [Norco]."  (AR 897, 905.)

- <u>Degenerative disc disease and chronic pain</u>:  In July 2018, Plaintiff reported a history of a motor vehicle accident in 1992 and was diagnosed with chronic pain syndrome; however, she had normal bulk, power, tone, sensation, coordination, and gait.  (AR 433–34, 670).  Between November 2018 and January 2019, Plaintiff's lower back and neck pain ranged between two to five on a scale of ten.  (AR 538, 554, 606, 686, 690.)  In May 2020, Plaintiff complained about lower back pain, but it "started after gardening" and was "worse after picking up boxes."  (AR 826.)  Between June 2020 and October 2020, Plaintiff continued to demonstrate normal strength, reflexes, sensation, and gait.  (AR 790–821.)  From June 2020 to April 2021, trigger point injections helped with Plaintiff's pain.  (AR 934–950.)  From July 2020 to April 2021, the ALJ said "objective findings on her physical examination remained unchanged and stable."  (AR 24.)

- <u>Left shoulder adhesive capsulitis</u>:  Plaintiff complained of left shoulder pain from November 2018 to January 2019.  (AR 557, 613, 642.)  In April 2019, Plaintiff's left shoulder pain was "much better" after a cortisone injection; additionally, her range of motion "significantly improved."  (AR 506.)  In June 2019, Plaintiff reported that her shoulder pain had returned; however, doctors noted that a fibromyalgia full body flare-up might be contributing to the shoulder pain.  (AR 498.)  In July 2019, Plaintiff declined a cortisone injection "because she wanted to wait and see if her fibromyalgia flare up improves."  (AR 495.)  In June 2020, Plaintiff reported doing well since a September 2019 cortisone injection; however, she also reported increasing pain and stiffness in the left shoulder.  (AR 823.)  Between December 2020 and April 2021, Plaintiff had no tenderness in the shoulder, normal stability, and normal motion.  (AR 919–931.)[4]

---

[4] The ALJ also summarized treatment notes related to Plaintiff's ulcerative colitis and mental impairments, as well as medical opinions and prior administrative findings.  (AR 25–27.)

1  Ultimately, the ALJ found Plaintiff to be not entirely credible:

2      In sum, the undersigned finds that the objective medical evidence
       discussed above establishes that the claimant has a greater sustained
3      capacity than the claimant alleges.  The undersigned thereby concludes
       that the claimant retains the capacity to perform work activities with the
4      limitations as set forth above.

5

6  (AR 27.)

7      **5. Analysis**

8          The Court now undertakes the two-step analysis to determine whether the ALJ

9  properly challenged Plaintiff's testimony.  See Johnson, 2022 WL 1553259, at *1;

10 Lingenfelter, 504 F.3d at 1035.  As discussed above, the ALJ found that Plaintiff's

11 "medically determinable impairments could reasonably be expected to cause the

12 alleged symptoms," and did not find evidence of malingering.  (AR 22.)  This satisfies

13 step one.  Trevizo, 871 F.3d at 678.  Accordingly, the ALJ may reject Plaintiff's testimony

14 about the severity of her pain only by providing "specific, clear, and convincing"

15 reasons.  See Brown-Hunter, 806 F.3d at 488–89; see also Leza v. Kijakazi, No. 21-16079,

16 2022 WL 819782, at *2 (9th. Cir. Mar. 17, 2022).  In addition to giving clear and

17 convincing reasons for rejecting Plaintiff's testimony, the ALJ "must specifically identify

18 the testimony she or he finds not to be credible and must explain what evidence

19 undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).

20 General findings are insufficient; the ALJ "must state which pain testimony is not

21 credible and what evidence suggests the complaints are not credible."  Dodrill v. Shalala,

22 12 F.3d 915, 918 (9th Cir. 1993) (citing Varney v. Sec'y of Health & Human Servs., 846

23 F.2d 581, 584 (9th Cir. 1988)).  Here, the ALJ failed to meet the demanding "clear and

24 convincing" standard for several reasons.

25      **a.  Discredited testimony**

26          As an initial matter, the ALJ did not "specifically identify" which testimony he

27 found not credible and why.  Holohan, 246 F.3d at 1208.  Instead, the ALJ generally

28 explained that "the claimant's statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence." (AR 22.) The Ninth Circuit has held that this boilerplate language does not rise to the level of "specific, clear, and convincing" reasons for discounting a claimant's subjective testimony. See, e.g., Treichler, 775 F.3d at 1103 (holding that a boilerplate introductory sentence falls short of "meeting the ALJ's responsibility" to discuss the objective evidence); Vasquez, 572 F.3d at 592 (finding that the "vague allegation that [plaintiff's claims] were 'not consistent with the objective medical evidence'" was inadequate to reject plaintiff's subjective testimony).

Additionally, the ALJ failed to identify specific testimony that was "not entirely consistent" with the medical evidence; instead, he provided a general summary and stated his non-credibility conclusion. (See AR 22–27.) "[S]imply reciting the medical evidence in support of [a] residual functional capacity determination" does not meet the "clear and convincing" standard for rejecting a claimant's testimony. Brown-Hunter, 806 F.3d at 489; see also Lambert, 980 F.3d at 1278 (holding that a "relatively detailed overview of [the plaintiff's] medical history" was not the same as providing clear and convincing reasons for discounting the plaintiff's testimony). Thus, the Court cannot accurately assess whether the ALJ provided specific, clear, and convincing reasons for rejecting Plaintiff's testimony where, as here, he "never identified *which* testimony [he] found credible, and never explained *which* evidence contradicted that testimony." Brown-Hunter, 806 F.3d at 494.

### b. **Stability of symptoms**

Second, the ALJ did not provide "specific, clear and convincing reasons" for finding that Plaintiff's symptoms are stable. Trevizo, 871 F.3d at 678. As Plaintiff points out, the ALJ's summary of the medical evidence over-emphasized certain examination results that showed normal findings. (J. Mot. at 11–12.) For example, the ALJ noted that in July 2018 Plaintiff presented for evaluation of chronic pain; however, she had "normal bulk, power and tone," "normal sensation," and "normal coordination and normal gait." (AR 23.) Similarly, the ALJ noted that between June 2020 and October

1    2020, Plaintiff received treatment for neck and back pain; however, she had "5/5

2    strength, intact reflexes, and intact sensation . . . normal gait and was able to stand

3    without difficulty."  (AR 24.)

4         Ninth Circuit courts have held that stability does not necessarily say anything as to

5    the intensity, persistence, and limiting effects of an individual's reported pain.  See, e.g.,

6    Debra D.B. v. Comm'r Soc. Sec. Admin., No. 18cv1811-HZ, 2020 WL 118255, at *6 (D.

7    Ore. Jan. 9, 2020) (although Plaintiff's condition may have been stable, "the ALJ did not

8    explain how this stability might contradict her subjective symptom testimony"); Kluthe

9    v. Berryhill, No. 16cv742-JLT, 2018 WL 775298, at *9 (E.D. Cal. Feb. 8, 2018) (finding the

10   ALJ improperly equated stability with functionality); Richardson v. Astrue, No. 10cv4186-

11   MAN, 2011 WL 5593937, at *6 (C.D. Cal. Nov. 17, 2011) ("notwithstanding the stability

12   of plaintiff's lupus, plaintiff's doctors opine that plaintiff will have functional limitations

13   as a result of her lupus").  Moreover, the same records that show Plaintiff's allegedly

14   "stable" symptoms reveal ongoing pain.  (See, e.g., AR 434 ("impression: chronic pain

15   syndrome"), 445 ("pain in thoracic spine," "low back pain," "intercostal pain," "pain in

16   left shoulder"), 603 ("chronic pain"), 670 ("long history of chronic pain"), 790 ("most

17   severe pain is located in the shoulder/shoulder blades"), 820 ("low back pain for many

18   years"), 1233 ("chronic pain").)  Even if some of Plaintiff's symptoms were "stable," the

19   ALJ did not adequately explain how this stability undermined her complaints of

20   widespread pain.

21              **c.  Conservative treatment**

22         Third, the ALJ failed to provide "specific, clear and convincing reasons" for finding

23   that Plaintiff's treatment was conservative.  Trevizo, 871 F.3d at 678.  The Ninth Circuit

24   has held that conservative treatment can be a basis for discounting a Plaintiff's

25   "testimony regarding severity of an impairment."  Parra v. Astrue, 481 F.3d 742, 751

26   (9th Cir. 2007) (holding the use of solely over-the-counter medication to treat pain was

27   "conservative treatment" the ALJ could reasonably rely on to discount Plaintiff's

28   subjective testimony).  However, "[a]ny evaluation of the aggressiveness of a treatment

regimen must take into account the condition being treated."  <u>Revels</u>, 874 F.3d at 667.

Here, the ALJ broadly asserted that Plaintiff's treatment was conservative because she

"did not require emergency room or hospital treatment or extensive evaluation or

testing" during the claimed disability period.  (AR 22.)  The ALJ did not explain what

specific treatment he considered "conservative," nor did he explain how any particular

treatment undermined Plaintiff's allegations of widespread pain.  (AR 22–27.)  By

contrast, the record reflects that Plaintiff attempted a wide array of treatments since

her alleged onset date of March 23, 2018.  Plaintiff saw a variety of specialists—a

rheumatologist, podiatrist, chiropractors, and pain management doctors—and tried

many medications, including the following opioids: Tramadol, Norco, and Hydrocodone.

(AR 525, 576, 606, 650, 686, 739, 765, 830, 872, 1279, 1334.)  Additionally, Plaintiff

received three rounds of trigger point injections in her cervical spine and two cortisone

injections in her left shoulder.  (AR 493, 509, 949, 955, 974.)

This course of treatment—namely a variety of injections and narcotic pain

medication—cannot be characterized as "conservative."  <u>See</u> <u>Garrison</u>, 759 F.3d at 1015

n. 20 ("[W]e doubt that epidural steroid shots to the neck and lower back qualify as

'conservative' medical treatment."); <u>Gilliland v. Saul</u>, 821 Fed. App'x 798, 799 (9th Cir.

2020) (finding treatment consisting of pain medications and injections was not

conservative); <u>Duarte v. Berryhill</u>, No. 16cv2654-W(BGS), 2018 WL 785819, at *8 (S.D.

Cal. Feb. 8, 2018) (same).  While Plaintiff has not undergone surgery since her alleged

onset date, the record does not reflect that more aggressive treatment options were

appropriate.  <u>See</u> <u>Lapeirre-Gutt v. Astrue</u>, 382 Fed. App'x 662, 664 (9th Cir. 2010) ("A

claimant cannot be discredited for failing to pursue non-conservative treatment options

where none exist").  Moreover, it would be unreasonable to expect more aggressive

treatment given the nature of some of Plaintiff's impairments such as lupus and

fibromyalgia.  <u>See</u> <u>Revels</u>, 874 F.3d at 667 (determining facet and epidural injections,

steroid injections, and pain medications were non-conservative treatment for

fibromyalgia).  There is no indication that Plaintiff's doctors disbelieved her pain

1   complaints; rather, they continued to adjust her medication, order new tests, and

2   recommend she seek additional opinions.  "Persistent attempts to obtain relief of

3   symptoms, such as increasing dosages and changing medications, trying a variety of

4   treatments, referrals to specialists, or changing treatment sources may be an indication

5   that an individual's symptoms are a source of distress and may show that they are

6   intense and persistent."  SSR 16-3p, available at 2017 WL 5180304, at *9.  Accordingly,

7   the ALJ has not provided clear and convincing evidence that Plaintiff's treatment was

8   conservative.

9                  **d.  Daily activities**

10          Lastly, the Commissioner argues that "Plaintiff's admitted activities belied her

11   complaints of disabling symptoms."  (J. Mot. at 17.)   The Commissioner notes how

12   Plaintiff lives alone, cares for her dogs, prepares her own meals, shops in stores,

13   practices yoga, and more.  (Id.)  However, the ALJ did not cite Plaintiff's daily activities as

14   a reason for discounting her pain testimony.  (J. Mot. at 19; AR 22.)  Thus, the Court

15   agrees with Plaintiff that this is a post-hoc justification by the Commissioner that should

16   not be seriously considered.  See Brown-Hunter, 806 F.3d at 492 (the district court is

17   "constrained to review the reasons the ALJ asserts") (quoting Connett v. Barnhart, 340

18   F.3d 871, 874 (9th Cir. 2003)); see also Garrison, 759 F.3d at 1010 (holding that the court

19   can only assess the reasoning provided by the ALJ in his decision).  Even if the ALJ had

20   raised Plaintiff's daily activities as a reason for rejecting her pain allegations, the Ninth

21   Circuit has advised that "ALJs must be especially cautious in concluding that daily

22   activities are inconsistent with testimony about pain, because impairments that would

23   unquestionably preclude work and all the pressures of a workplace environment will

24   often be consistent with doing more than merely resting in bed all day."  Garrison, 759

25   F.3d at 1016; Albertson v. Colvin, 659 Fed. App'x 372, 374 (9th Cir. 2016) (holding the

26   claimant's ability to perform basic household chores and occasionally run errands was

27   not enough to discredit her pain testimony).  Further, "disability claimants should not be

28   penalized for attempting to lead normal lives in the face of their limitations."  Reddick v.

1    <u>Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted).  Thus, Plaintiff's ability to

2    perform daily activities is not dispositive of her ability to work eight hours a day, five

3    days a week.

4         **6. Conclusion**

5         The ALJ failed to specifically identify which of Plaintiff's statements he found not

6    credible, or which medical evidence contradicted that testimony.  <u>Holohan</u>, 246 F.3d at

7    1208.  Nevertheless, the Court has assessed the ALJ's purported reasons for discounting

8    Plaintiff's testimony— (1) that her symptoms are stable and (2) that the treatment she

9    received was conservative—and finds that they are not supported by "specific, clear,

10   and convincing reasons."  <u>Brown-Hunter</u>, 806 F.3d at 494.  The Court further finds that

11   the ALJ's failure to provide clear and convincing reasons for discounting Plaintiff's pain

12   testimony was not harmless because it "precludes us from conducting a meaningful

13   review."  <u>Id.</u> at 489; <u>see also</u> <u>Michael Louis W. v. Kijakazi</u>, No. 20cv2277-LL(MSB), 2022

14   WL 2701988, at *10 (S.D. Cal. July 12, 2022) (finding harmful error where the ALJ failed

15   to specify which of Plaintiff's statements regarding pain and physical dysfunction he

16   discredited).  On remand, the ALJ should reevaluate Plaintiff's symptom testimony and

17   specifically identify which portions of it, if any, the ALJ finds not credible and why.

18   **B.  <u>Whether the ALJ Failed to Develop the Medical Opinion Evidence</u>**

19        **1. Summary of the parties' arguments**

20        Plaintiff next argues that the ALJ "failed to develop the medical opinion evidence

21   regarding Plaintiff's physical limitations and instead served as his own medical expert."

22   (J. Mot. at 21–22.)  She contends the ALJ erred by not ordering a consultative

23   examination or consulting a medical expert about Plaintiff's physical limitations.  (<u>Id.</u> at

24   21.)  Instead, Plaintiff says the ALJ improperly "relied on his own lay review of the raw

25   medical evidence," and made three errors: (1) finding that Plaintiff could perform

26   frequent overhead reaching despite evidence of bilateral shoulder adhesive capsulitis;

27   (2) not including work restrictions to account for Plaintiff's cervical dysfunction; and (3)

28   not including work restrictions to account for Plaintiff's ulcerative colitis and frequent

1    bowel movements, such as permitting extra bathroom breaks and easy access to a

2    restroom.  (Id. at 21–22.)  Accordingly, Plaintiff argues remand is necessary for further

3    development of the medical opinion evidence and reevaluation of Plaintiff's residual

4    functional capacity ("RFC").  (Id. at 22.)

5        In response, the Commissioner argues the ALJ's RFC finding was a reasonable

6    interpretation of the medical and other evidence.  (Id. at 22–24.)  The Commissioner

7    maintains the ALJ properly considered the medical records, Plaintiff's subjective

8    complaints, prior administrative medical findings ("PAMFs"), and medical opinions and

9    assessed an RFC that included reasonable accommodations for Plaintiff's impairments.

10   (Id. at 23–24.)  Thus, the Commissioner contends that "Plaintiff's lay speculation that

11   bilateral shoulder adhesive capsulitis, cervical dysfunction, and ulcerative colitis

12   warranted additional limitations does not refute the ALJ's reasonable interpretation of

13   the record evidence in crafting Plaintiff's RFC."  (Id. at 24.)

14       **2.  Applicable law**

15       In Social Security cases, the ALJ has a duty to develop the record fully and fairly

16   and to assure that the claimant's interests are considered.  See Garcia v. Comm'r Soc.

17   Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citing Celaya v. Halter, 332 F.3d 1177, 1183 (9th

18   Cir. 2003)); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting Brown v.

19   Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  The ALJ "must be especially diligent in

20   ensuring that favorable as well as unfavorable facts and circumstances are elicited."

21   Celaya, 332 F.3d at 1183 (quoting Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992)).

22   "[A]n ALJ's duty to develop the record further is triggered only when there is ambiguous

23   evidence or when the record is inadequate to allow for proper evaluation of the

24   evidence."  Agatucci v. Berryhill, 721 F. App'x 614, 617 (9th Cir. 2017) (quoting McLeod

25   v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011)).

26       The revised regulations state that the claimant is generally "responsible for

27   providing the evidence" used to make the residual functional capacity ("RFC")

28   determination.  See 20 C.F.R. § 404.1545(a)(3).  However, before making a non-disability

1  determination, the agency is "responsible for developing your complete medical history,

2  including arranging for a consultative examination(s) if necessary, and making every

3  reasonable effort to help you get medical reports from your own medical sources." Id.

4  Additionally, the agency must develop an individual's "complete medical history for at

5  least the 12 months preceding the month in which you file your application." See 20

6  C.F.R. § 404.1512(b)(1).  The ordering of a consultative examination is discretionary.  See

7  20 C.F.R. § 404.1517.

8      **3.  Analysis**

9      Plaintiff's argument that the ALJ neglected his duty to develop the record by not

10  ordering a consultative examination or consulting a medical expert falls short.  (J. Mot.

11  at 21.)  "[A]n ALJ's duty to develop the record further is triggered only when there is

12  ambiguous evidence or when the record is inadequate to allow for proper evaluation of

13  the evidence." Agatucci, 721 F. App'x at 617 (internal citation omitted).  Here, Plaintiff

14  has not demonstrated that the record before the ALJ was ambiguous or inadequate to

15  allow for proper evaluation.  See Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001)

16  (holding the ALJ had no duty to develop the record because the record was "neither

17  ambiguous nor inadequate").  In making his RFC determination, the ALJ reviewed

18  treatment notes dealing with Plaintiff's lupus, fibromyalgia, and rheumatoid arthritis (AR

19  22–23); degenerative disc disease and chronic pain (AR 23–24); left shoulder adhesive

20  capsulitis (AR 24–25); ulcerative colitis (AR 25); and mental impairments (AR 25–26).

21  These records covered more than twelve months prior to Plaintiff's September 6, 2019

22  application date.  (AR 18–26, 274.)  See also 20 C.F.R. § 404.1512(b)(1) (requiring the

23  agency to develop the "complete medical history for at least the 12 months preceding

24  the month in which you file your application").  The ALJ also considered Plaintiff's

25  testimony, prior administrative medical findings, and medical opinions, including state

26  agency reports from the initial and reconsideration levels.  (See generally AR 18–27.)

27      On December 6, 2019, at the initial level of review, Dr. S. Lee reviewed Plaintiff's

28  medical records from September 2019 through February 2020 and concluded that

Plaintiff was not disabled and could perform work at the light exertional level, with some limitations.  (AR 132–134.)  On July 9, 2020, at the reconsideration level of review, Dr. G. Spellman reviewed Plaintiff's medical records from September 2019 through July 2020 and reached the same conclusion.  (AR 166–168.)  The ALJ found that "although the record reveal[ed] stable findings, the claimant's chronic symptoms support[ed] a finding of limitations greater" than those assessed by the state agency doctors; thus, the ALJ determined Plaintiff had the RFC to perform "sedentary" rather than "light" work.  (AR 21, 27.)  It was appropriate for the ALJ to make this RFC determination after considering Plaintiff's testimony and all relevant evidence.  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  Ultimately, it is the plaintiff's responsibility to prove disability and "provid[e] the evidence to be used in making the [residual functional capacity] finding."  Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir.2006) (internal citations and quotation marks omitted); see also 20 C.F.R. §§ 404.1512(c); 404.1545(a)(3).  Consultative examinations, which are discretionary, may be called for if there is evidence of an impairment but the evidence is insufficient to determine disability.  See 20 C.F.R. § 404.1517; Rochin v. Barnhart, 204 Fed. App'x 601, 603 (9th Cir. 2006).  Plaintiff has not demonstrated that the evidence before the ALJ—which included years of medical records, multiple medical opinions, and Plaintiff's testimony— was insufficient to determine disability.  Thus, the ALJ did not have a duty to develop the record further.

**C. Whether the ALJ Formulated a Residual Functional Capacity that Reasonably Accommodated Plaintiff's Ulcerative Colitis**

**1. Summary of the parties' arguments**

Plaintiff argues the ALJ "failed to formulate a residual functional capacity that reasonably accommodated Plaintiff's ulcerative colitis."  (J. Mot. at 25–26.)  At the administrative hearing, Plaintiff testified she used the restroom eight to ten times a day, experienced fecal urgency, and suffered from accidents.  (Id.; AR 48.)  Plaintiff contends the medical record also supports her history of ulcerative colitis and frequent bowel

movements.  (J. Mot. at 26.)  For example, in November 2018 Plaintiff had four to fourteen bowel movements a day and medication provided minimal relief.  (Id.; AR 430.)  In April 2019, she had four to six painful bowel movements a day.  (J. Mot. at 26; AR 420.)  Finally, in June 2020, she sought emergency treatment for chronic diarrhea, reporting that she had diarrhea fourteen times a day.  (J. Mot. at 26; AR 778.)  Plaintiff argues the ALJ discounted her colitis and associated symptoms because she purportedly was not receiving treatment and had not seen a gastrointestinal ("GI") doctor in years.  (J. Mot. at 26.)  However, Plaintiff says the ALJ was mistaken because Plaintiff sought treatment for her colitis and frequent bowel movements during the alleged disability period.  (Id.; AR 418–20, 430, 778.)  Given the frequency and urgency of her bowel movements, Plaintiff argues that the ALJ should have calculated the RFC allowing for extra, longer bathroom breaks and closer proximity to a bathroom.  (J. Mot. at 26.)  Plaintiff asserts remand is necessary for her colitis-related symptoms to be properly considered in the RFC determination.  (Id.)

In response, the Commissioner argues the ALJ properly discounted Plaintiff's testimony related to her ulcerative colitis, highlighting inconsistencies between the record and the medical reports cited by Plaintiff.  (Id. at 27–28.)  First, the November 2018 report was by a GI specialist; however, there is no record of Plaintiff seeing a GI specialist since then.  (Id. at 27; AR 25, 430–33.)  Second, Plaintiff's April 2019 report of four to six bowel movements per day was to a nurse via telephone.  (J. Mot. at 27; AR 25, 419–20.)  Third, during the June 2020 emergency visit Plaintiff admitted she stopped taking her medication two weeks prior, and this could have caused her diarrhea episode.  (J. Mot. at 27; AR 25, 778–83.)  The Commissioner also notes how in 2020 and 2021, Plaintiff told Dr. Kotha about her ulcerative colitis and lymphocytic colitis, how she had taken various steroids on and off for four years, but then stopped following up with her GI specialist and treating her GI symptoms.  (J. Mot. at 28; AR 25, 739–40, 742, 744, 758–59, 761, 763, 765, 767, 769, 771, 773, 775, 897, 899, 901, 903, 905, 907.)  Dr. Kotha recommended Plaintiff follow up with a GI specialist; however, there is no evidence she

1   did so.  (J. Mot. at 28.)  The Commissioner contends "Plaintiff's failure to seek treatment

2   for her GI issues was inconsistent with her testimony that they were severe and/or

3   debilitating."  (Id.)

4   **2.  Applicable law**

5   It is the ALJ's responsibility, not the claimant's physicians, to determine an

6   individual's RFC.  See 20 C.F.R. § 404.1545.  RFC is a claimant's ability to do work-related

7   activities on a sustained basis (i.e., eight hours a day, five days per week) despite

8   physical and mental limitations.  Id. § 404.1545(a).  Thus, it represents the maximum

9   amount of work a claimant can perform based on all relevant evidence.  Id.  In

10  formulating an RFC, the ALJ must consider all of the claimant's impairments, including

11  those that are non-severe.  See 20 C.F.R. § 404.1520(e); see also Buck v. Berryhill, 869

12  F.3d 1040, 1048–49 (9th Cir. 2017) (quoting SSR 96-8P, 1996 WL 374184, at *5).  "The

13  RFC therefore *should* be exactly the same regardless of whether certain impairments are

14  considered 'severe' or not."  Buck, 869 F.3d at 1048.  Additionally, the agency must

15  consider the claimant's testimony regarding their capabilities and consider all relevant

16  evidence, including medical records, lay evidence, and pain.  See Robbins, 466 F.3d at

17  883; SSR 96-8P, 1996 WL 374184, at *5.  The Ninth Circuit has generally held that "an

18  RFC that fails to take into account a claimant's limitations is defective."  Valentine v.

19  Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009); Samples v. Comm'r Soc. Sec.

20  Admin, 466 Fed. App'x 584, 586 (9th Cir. 2012).

21  **3.  Analysis**

22  After reviewing the record and the parties' arguments, the Court finds that the

23  ALJ erred by not accounting for Plaintiff's history of ulcerative colitis and associated

24  limitations in his RFC determination.  The ALJ found Plaintiff had the RFC to perform

25  sedentary work, subject to the following limitations:

26  [S]he is unable to climb ladders, ropes or scaffolds.  She is unable to crawl.
    She is able to occasionally climb ramps and stairs.  She is able to
27  occasionally balance, stoop, kneel and crouch.  She is able to frequently
28  reach overhead with bilateral upper extremities.  She must avoid

22

1
2
3
4
5
6

concentrated exposure to fumes, odors, gases and other pulmonary irritants.  She is able to understand, remember, and carry out simple, routine tasks.  She is able to have occasional interaction with the general public and only occasional work-related, non-personal, non-social interaction with co-workers and supervisors.  She is limited to jobs requiring only simple work-related decisions.  However, she is able to keep pace sufficient to complete tasks and meet quotas typically found in unskilled work.  (AR 20–21.)

7
8
9
10
11

In reaching this determination, the ALJ explained he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as the medical opinions and prior administrative medical findings.  (AR 22.)  With respect to Plaintiff's ulcerative colitis, the ALJ said the following:

12
13
14
15
16

As for claimant's ulcerative colitis, treatment notes from Dr. Kotha between February 2020 and November 2020 reveal that the claimant had a history of diagnosis of ulcerative colitis and lymphcetic [sic] colitis.  She reported intermittent abdominal bloating, diarrhea and constipation. However, her abdomen was nontender, with no rebound or guarding.  She also reported that she has not seen her GI doctor for many years, and she was not receiving any treatment for her colitis.  (AR 25.)

17
18
19
20
21
22

Aside from this paragraph, the ALJ did not engage in any substantive discussion of Plaintiff's ulcerative colitis and associated fecal frequency and urgency.  By contrast, during the administrative hearing Plaintiff testified that she used the restroom approximately eight to ten times per day and sometimes suffered from accidents due to fecal urgency.  (AR 48.)  Consistent with this testimony, the medical record revealed the following:

23
24
25
26
27

- In June 2013, doctors noted that Plaintiff "developed diarrhea" and various medications (Imodium, Lomotil, Cipro, Pepto) did not help.  Dr. Gupta diagnosed Plaintiff with "lymphocytic colitis . . . with subacute exacerbation of diarrhea."  Plaintiff said she experienced an "increase in diarrhea: 8–10 times / day."  (AR 418.)
- On June 11, 2014, Plaintiff reported experiencing five to six bowel movements daily with medication (Uceris), and ten to twelve bowel

28

movements daily without medication.  Plaintiff also reported fecal urgency and accidents.  (AR 419.)

- On July 26, 2018, Dr. Frishberg noted that Plaintiff has "chronic gastrointestinal issues" and a diagnosis for lymphocytic colitis.  (AR 433.)
- On November 26, 2018, Dr. Dever noted that Plaintiff has four to fourteen loose bowel movements daily and assessed her with "[c]hronic diarrhea, onset since circa 2013."  He also noted that Plaintiff was previously diagnosed with lymphocytic colitis but "never responded to therapy for this."  (AR 430, 432.)
- On November 27, 2018, Plaintiff was noted as having "abdominal bloating" and "chronic diarrhea."  (AR 418.)
- On April 18, 2019, Plaintiff reported an "ongoing issue with diarrhea x 6 years," "four to six bowel movements daily," and "horrid pain when stools move through."  (AR 420.)
- On June 3, 2020, Dr. Friedberg noted Plaintiff's "history of colitis with chronic diarrhea" and that her diarrhea had gotten "much worse, going at least 14 times today and associated with 7/10 crampy abdominal pain."  (AR 778.)
- On June 9, 2020, Dr. Roozchehr recorded that Plaintiff "went to ER 2 days ago for diarrhea."  (AR 847.)

The Commissioner highlights inconsistencies in Plaintiff's testimony about the frequency of her bowel movements: (1) four to fourteen daily bowel movements in November 2018; (2) four to six daily bowel movements in April 2019; and (3) diarrhea fourteen times in one day in June 2020.  (J. Mot. at 27.)  Because the ALJ did not identify inconsistencies as a reason for discrediting Plaintiff's colitis testimony (AR 21–27), this reason is not properly before the Court.  See Brown-Hunter, 806 F.3d at 492 (9th Cir. 2015) (the district court is "constrained to review the reasons the ALJ asserts").  The ALJ's only asserted reason for discounting Plaintiff's colitis and associated symptoms appears to be that she had not "seen her GI doctor for many years, and she was not receiving any treatment for her colitis."  (AR 25.)  However, the record demonstrates Plaintiff had a history of ulcerative colitis, fecal frequency, urgency, and accidents dating back to June 2013, and that Plaintiff sought treatment for these issues during the alleged disability period.  (See, e.g., AR 418–20, 430–33, 778, 847.)

An ALJ's RFC must consider all of the claimant's impairments.  See 20 C.F.R. § 404.1520(e); see also Buck, 869 F.3d at 1048–49.  Nothing in the record, including the hypotheticals the ALJ posed to the vocational expert (AR 56–60), demonstrates that the ALJ seriously considered Plaintiff's ulcerative colitis and associated limitations in crafting the RFC.  Plaintiff's colitis could significantly impact her ability to perform sustained activities in a work setting, such as if she needs to take frequent bathroom breaks or be located near a bathroom.  The ALJ's ambiguous explanation that Plaintiff's testimony is "not entirely consistent" with the record is insufficient.  See Treichler, 775 F.3d at 1103 (finding the use of boilerplate language falls short of the ALJ's responsibility to provide "a discussion of the evidence").  Because an "RFC that fails to take into account a claimant's limitations is defective," the Court concludes that the ALJ erred by failing to substantively consider Plaintiff's ulcerative colitis.  Valentine, 574 F.3d at 690; see also McCawley v. Astrue, 423 Fed. App'x 687, 689 (holding that RFC "may be the most critical finding contributing to the final . . . decision about disability") (internal citations omitted).  On remand, the ALJ should consider the evidence regarding Plaintiff's ulcerative colitis and associated limitations when making the RFC determination.

**D.  Whether the ALJ Erroneously Departed from the Opinion of the State Agency Psychiatrist Without Explanation**

**1.  Summary of the parties' arguments**

Plaintiff argues the ALJ erroneously departed from the opinion of state agency psychiatrist, H.N. Hurwitz, M.D., without explanation.  (J. Mot. at 29–31.)  Specifically, the ALJ's RFC "omitted Dr. Hurwitz['s] assessment that Plaintiff should be limited to non-public jobs."  (J. Mot. at 29; AR 21–22.)  Plaintiff contends the ALJ violated agency policy and Ninth Circuit precedent by not providing a "valid explanation supported by substantial evidence" for this omission.  (J. Mot. at 30.)  Further, Plaintiff argues this error was not harmless because the job of escort vehicle driver—one of the jobs the ALJ found Plaintiff could perform—necessarily requires public interaction.  (J. Mot. at 30–31.)  Had the ALJ adopted Dr. Hurwitz's opinion and restricted Plaintiff to non-public

1    jobs, Plaintiff argues that the ALJ would not find her suitable to be an escort vehicle

2    driver.  (Id.)

3         In response, the Commissioner says the ALJ misstated Dr. Hurwitz's findings as

4    including a limitation to "unskilled job[s] with no public contact;" however, the doctor

5    actually found Plaintiff could perform "unskilled non public jobs" and she was

6    "moderately limited" from interacting appropriately with the general public.  (J. Mot. at

7    32; compare AR 27, with AR 129, 135.)  Nevertheless, the Commissioner argues the ALJ's

8    misstatement was harmless because "he reasonably translated Dr. Hurwitz's

9    conclusions into limitations to jobs that require no more than simple, work-related

10   decisions; a pace . . .  typically found in unskilled work; and 'occasional interaction with

11   the general public.'"  (J. Mot. at 32; AR 21–22, 27.)  Further, the Commissioner argues

12   that the ALJ included these functional limitations in his hypothetical question, and the

13   vocational expert testified that a hypothetical individual fitting this profile could still

14   perform three unskilled jobs that exist in significant numbers in the national economy.

15   (J. Mot. at 32; AR 57–58.)  Because the ALJ's hypothetical included all the limitations he

16   found credible and supported by substantial evidence, the Commissioner argues the

17   ALJ's reliance on the expert's testimony was proper.  (J. Mot. at 32; AR 57–58.)

18        **2.  Applicable law**

19        Plaintiff applied for supplemental security income on September 6, 2019.  (AR

20   274.)  Because this is after March 27, 2017, the Social Security Administration's revised

21   regulations for considering medical opinions apply.  See 20 C.F.R. § 404.1520c (2017).

22   Under the revised regulations, the ALJ does "not defer or give any specific evidentiary

23   weight, including controlling weight, to any medical opinion(s)."  Id. § 404.1520c(a).

24   Instead, the ALJ must the evaluate the persuasiveness of those opinions using the

25   following factors: supportability, consistency, the relationship between the source and

26   the claimant, the source's specialization, and other factors such as the source's

27   knowledge of other evidence and whether there was subsequently submitted evidence.

28   Id. § 404.1520c(c)(1)–(5).

The two most important factors are supportability and consistency.  Id. § 404.1520c(b)(2).  "Supportability" measures the degree to which objective medical evidence and supporting explanations buttress a medical finding.  Id. §§ 404.1520c(c)(1); 416.920c(c)(1).  "Consistency" is the extent to which an opinion or finding is consistent with evidence from other medical sources and non-medical sources in the record.  Id. §§ 404.1520c(c)(2); 416.920c(c)(2).  The more relevant the objective evidence and supporting explanations are to support the medical source, and the more consistent the source is with other evidence in the record, the more persuasive the medical opinion will be.  See Zhu v. Comm'r of Soc. Sec., No. 20-3180, 2021 WL 2794533, at *6 (10th Cir. July 6, 2021).  Under the revised regulations, "an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." Woods v. Kijakazi, 32 F. 4th 785, 787 (9th Cir. 2022); see also Sloane S. v. Kijakazi, No. 21cv1043-MMA-MSB, 2023 WL 2017284, at *4 (S.D. Cal. Feb. 15, 2023).

### 3. Dr. Hurwitz's opinion

Dr. Hurwitz evaluated Plaintiff's medical file on February 26, 2020, opining that she "should be able to sustain with unskilled non public jobs."  (AR 129.)  He noted that a psychological consultative examination revealed an "unremarkable" mental status examination and the medical source statement "considered no more than mild impairments."  (Id.)  Dr. Hurwitz prepared a "Mental Residual Functional Capacity Assessment," which assessed the following limitations:

- Understanding and memory limitations: Yes
  - Ability to understand and remember very detailed instructions: Moderately limited

- Sustained concentration and persistence limitations: Yes
  - Ability to carry out detailed instructions: Moderately limited

- Social interaction limitations: Yes
  - Ability to interact appropriately with the general public: Moderately limited

(AR 134–35.)

### 4. Analysis

The ALJ summarized Dr. Hurwitz's opinion as limiting Plaintiff to an "unskilled job with no public contact" and found it "persuasive because it is consistent with and supported by the record as a whole."  (AR 27.)  He abided by the revised regulations by addressing the consistency and supportability factors, albeit briefly.  See 20 C.F.R. § 416.920c(b)(2).  Given the ALJ's endorsement of Dr. Hurwitz's opinion, the only matter before the Court is whether the ALJ's RFC reasonably accounted for the limitations identified by Dr. Hurwitz.  The RFC needs to be consistent with the relevant assessed limitations, but not identical to them.  See Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010) (holding the ALJ did not err by rejecting a doctor's evaluation that the plaintiff "could not perform simple, repetitive tasks in an environment without public contact or background activity" because he sufficiently incorporated the doctor's observations into his RFC determination).

Here, Dr. Hurwitz found that Plaintiff had three moderate limitations: (1) ability to understand and remember very detailed instructions; (2) ability to carry out detailed instructions; and (3) ability to interact appropriately with the general public.  (AR 134–35.)  The Agency considers a moderate limitation to mean the individual has a "fair" ability to function "independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00F(2)(c).  The ALJ appropriately incorporated Dr. Hurwitz's limitations into his RFC determination by limiting Plaintiff to: (1) occasional interaction with the general public; (2) occasional work-related, non-personal, non-social interaction with co-workers and supervisors; and (3) jobs requiring only simple, work-related decisions.  (AR 21.)  Plaintiff argues that because Dr. Hurwitz also opined that Plaintiff "should be able to sustain with unskilled non public jobs" (AR 129), the ALJ erred by not including a specific limitation to "non-public jobs."  (J. Mot. at 29.)  However, the ALJ's RFC sufficiently reduced the stress of social interactions by limiting Plaintiff to unskilled work and only occasional interaction with the public and co-workers (AR 21), accommodations that are consistent with Dr. Hurwitz's assessment of

28

1    only "moderate" social interaction limitations.  See, e.g., Stubbs-Danielson v. Astrue,

2    539 F.3d 1169 (9th Cir. 2008) (finding an ALJ's limitation to "simple, routine, repetitive"

3    work sufficiently accounted for medical-opinion evidence that claimant had moderate

4    mental limitations); McIntosh v. Colvin, No. 16cv963-JAH-BGS, 2018 WL 1101102, at *8

5    (S.D. Cal. Feb. 26, 2018) (holding an ALJ did not err by failing to "explicitly include

6    Plaintiff's moderate limitations verbatim" because the RFC properly incorporated the

7    limitations and was supported by substantial evidence);  Menges v. Berryhill, No.

8    16cv1766-BAM, 2018 WL 1567786, at *8 (E.D. Cal. Mar. 30, 2018) ("A restriction to

9    simple, repetitive tasks amply accounts for any moderate/mild limitations in mental or

10   social functioning").  These limitations are also consistent with Dr. Glassman's opinion

11   that Plaintiff had only "mild impairment in her capacity to behave in a socially

12   appropriate manner and to get along adequately with others."  (AR 20.)

13        Finally, even if the ALJ erred, Plaintiff has not demonstrated that such error was

14   harmful.  Tommasetti, 533 F.3d at 1038 ("The court will not reverse an ALJ's decision for

15   harmless error, which exists when it is clear from the record that the ALJ's error was

16   inconsequential to the ultimate non-disability determination").  Plaintiff argues that the

17   job of "escort vehicle driver" involves public interaction, and therefore Plaintiff would

18   be unable to perform this job.  According to the Dictionary of Occupational Titles, an

19   escort vehicle driver:

20      [d]rives vehicle equipped with warning lights and signs to escort trucks
      hauling mobile homes on public thoroughfares: Precedes escort and
21      maintains specified distance between pilot vehicle and escort to provide
22      warning to other motorists and to clear traffic at locations.  Communicates
      by two-way radio with truck and other pilot vehicle drivers to coordinate
23      changes in speed and route, emergencies, or traffic congestion.

24   DICOT 919.663-022, 1991 WL 687886.

25   Based on this description, an escort vehicle driver must occasionally interact with other

26   motorists to provide warnings.  This level of social interaction appears consistent with a

27   moderate limitation.  Moreover, "[w]here evidence is susceptible to more than one

28   rational interpretation, it is the ALJ's conclusion that must be upheld."  Burch, 400 F.3d

1   at 679; <u>Tommasetti</u>, 533 F.3d at 1038.  For the foregoing reasons, the ALJ did not

2   commit legal error by failing to explicitly include a limitation to "non-public jobs"

3   because his RFC otherwise incorporated Dr. Hurwitz's limitations and is supported by

4   substantial evidence.  <u>Woods</u>, 32 F. 4th at 787.

5   E.  **<u>Whether Plaintiff Could Perform a Significant Number of Jobs in the National</u>**

6      **<u>Economy</u>**

7      **1.  Summary of the parties' arguments**

8          Finally, Plaintiff argues the ALJ erred at step five because "Plaintiff was not able to

9   perform a significant number of jobs in the national economy."  (J. Mot. at 33–36.)  The

10  vocational expert ("VE") testified that a hypothetical individual with Plaintiff's RFC could

11  perform the jobs of document preparer, addresser, and escort vehicle driver.  (AR 58.)

12  Plaintiff argues that contrary to the VE's testimony, the jobs of document preparer

13  (allegedly constituting 19,078 jobs in the national economy) and addresser (allegedly

14  constituting 2,711 jobs in the national economy) are now obsolete.  (J. Mot. at 34.)

15  Additionally, Plaintiff argues she is unable to perform the work of an escort vehicle

16  driver because it involves public interaction and no readily available bathroom.  (<u>Id.</u> at

17  36.)  In response, the Commissioner argues that the ALJ was entitled to rely on the VE's

18  testimony as to the number of jobs existing in the national economy.  (<u>Id.</u> at 36.)

19  Further, "even if there were not 19,078 document preparer and 2,711 addresser jobs in

20  the national economy . . . there would remain 31,139 escort vehicle driver jobs available

21  for Plaintiff."  (<u>Id.</u> at 37.)  The Commissioner asserts that 31,139 jobs is a significant,

22  nationwide number and supports the ALJ's step-five finding of non-disability.  (<u>Id.</u>)

23     **2.  Applicable law**

24         At step five of the sequential evaluation process, "the Commissioner has the

25  burden 'to identify specific jobs existing in substantial numbers in the national economy

26  that [a] claimant can perform despite [his] identified limitations.'"  <u>Zavalin v. Colvin</u>, 778

27  F.3d 842, 845 (9th Cir. 2015) (quoting <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir.

28  1995)); <u>see also</u> 20 C.F.R. § 416.920(g).  In determining if other suitable work exists that

the claimant may be able to perform, the ALJ is to rely on the Dictionary of Occupational Titles ("DOT") and may also rely on the testimony of VEs who testify about specific occupations that a claimant can perform considering his or her RFC.  See Zavalin, 778 F.3d at 845–46; Valentine, 574 F.3d at 689.  "Given its inherent reliability, a qualified vocational expert's testimony as to the number of jobs existing in the national economy that a claimant can perform is ordinarily sufficient by itself to support an ALJ's step-five finding."  Ford v. Saul, 950 F.3d 1141, 1160 (9th Cir. 2020) (citing Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999)); see also Kilpatrick v. Kijakazi, 35 F.4th 1187, 1192–93 (9th Cir. 2022).

An ALJ may not "rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the [DOT]."  Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007); see also SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).  Pursuant to SSR 00-4p, the ALJ has an affirmative duty to inquire into the existence of potential conflicts between the VE's testimony and the DOT, and obtain an explanation from the VE regarding any conflicts that do exist.  See SSR 00-4p, 2000 WL 1898704; Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1003 (9th Cir. 2015); Massachi, 486 F.3d at 1152–53.  If there is conflict between the VE's testimony and the DOT, "the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT."  Massachi, 486 F.3d at 1153.  Failure to conduct such inquiry is analyzed under the harmless error standard.  See Zavalin, 778 F.3d at 848; see also Massachi, 486 F.3d at 1154 n.19 (stating that the error is harmless where "there [is] no conflict, or if the vocational expert ha[s] provided sufficient support for her conclusion so as to justify any potential conflicts.").

### 3.  The vocational expert's testimony and ALJ's treatment thereof

At the administrative hearing on June 4, 2021, the ALJ asked the VE to consider the following:

///

22cv695-DMS (MSB)

1
2
3
4
5
6
7
8
9
10

[A]ssume a hypothetical individual.  The same age, education, and work experience as the Claimant in this case with the following [RFC].  Please assume a hypothetical individual that can do work at a sedentary exertional level.  The individual can occasionally climb ramps and stairs; never climb ladders, ropes, scaffolds; occasional balance, stoop, kneel, crouch, never crawl.  The individual would be further limited to frequent, overhead reaching with the bilateral upper extremities.  And the individual must avoid concentrated exposure to fumes, odors, gases, and other pulmonary irritants.  The individual can understand, remember, and carry out simple, routine tasks; have only occasional interaction with the general public; only occasional, work-related, non-personal, non-social interaction with coworkers and supervisors; and is limited to jobs requiring only simple, work-related decisions.  However, can keep pace sufficient to complete tasks and meet quotas typically found in unskilled work.

11
12
13
14
15
16
17

(AR 57–58.)  The VE testified that a hypothetical individual with this profile could not complete Plaintiff's past work.  (AR 58.)  However, the VE identified three sedentary, unskilled jobs that Plaintiff could perform in the national economy: (1) document preparer, 249.587-018; (2) addressing clerk, 209.587-010; and (3) escort vehicle driver, 919.633-022.  (AR 58.)  The ALJ determined that the VE's testimony was "consistent with the information contained in the [DOT]" and a finding of "not disabled" was appropriate.  (AR 28–29.)

18

### 4. Analysis

19
20
21
22
23
24
25
26
27
28

Plaintiff argues that the first two jobs—document preparer and addresser—have become obsolete since the DOT's publication in 1991 and no longer exist in significant numbers in the national economy.  (J. Mot. at 34.)  The DOT states that a document preparer "prepares documents . . . for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices."  DICOT 294.587-018, 1991 WL 672349.  Additionally, the DOT defines an addresser as someone who "addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing."  DICOT 209.587-010, 1991 WL 671797.  Plaintiff correctly points out that some Ninth Circuit courts have found these jobs to be obsolete.  See, e.g., Skinner v. Berryhill, No. 17cv3795, 2018 WL 1631275, *6 (C.D. Cal. April 2, 2018) (noting that the

22cv695-DMS (MSB)

occupation of "addresser" has "significantly dwindled in number since 1991" and highlight its "archaic" DOT description); Rhoades v. Comm'r of Soc. Sec., Case No. 18-1264, 2019 WL 3035517, *1 (E.D. Cal. July 11, 2019) (the agency seemingly agreed that the occupations of document preparer and addresser are obsolete on their face); Wood v. Berryhill, No. 17cv5430-RJB-BAT, 2017 WL 6419313, at *2 (W.D. Wash. Nov. 17, 2017) ("[T]he positions of document preparer and nut sorter do not exist in significant numbers in the national economy."). Ultimately, the question of whether they are obsolete need not be addressed because the estimated number of document preparer jobs (19,078) and addresser jobs (2,711) are both below the 25,000 job threshold identified by the Ninth Circuit as "significant." Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 529 (9th Cir. 2014); see also Beltran v. Astrue, 700 F.3d 386, 390 (9th Cir. 2012) (determining 1,680 jobs nationally was not significant).

The Commissioner argues that the 31,139 jobs estimated for escort vehicle driver alone constitutes a significant number of jobs. (J. Mot. at 37.) The Court agrees. In Gutierrez, the Ninth Circuit found that 25,000 nationwide jobs was a "close call" but constituted a significant number. 740 F.3d at 529. In this case, the more than 31,000 escort vehicle driver jobs easily exceeds the 25,000 job threshold. (AR 28.) Plaintiff does not argue that the job-number estimate is erroneous, nor does she identify any conflicts between the DOT and VE's testimony. Although the document preparer and addresser positions do not exist in significant nationwide numbers, the ALJ has nonetheless met his step-five burden by finding that an individual with Plaintiff's RFC could perform the job of escort vehicle driver with more than 31,000 jobs nationwide. Zavalin, 778 F.3d at 845 (9th Cir. 2015); see also 20 C.F.R. § 416.920(g). Further, the ALJ reasonably relied on the VE's testimony in reaching this conclusion. Ford, 950 F.3d at 1160. Once again, the Court notes that "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Burch, 400 F.3d at 679. The Court does not address whether any of the jobs are obsolete.

///

22cv695-DMS (MSB)

## VI. CONCLUSION AND RECOMMENDATION

The reviewing court may enter a "judgment affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  Id.  The reviewing court has discretion in determining whether to remand for further proceedings or award benefits.  See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  See Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984).  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, where the record has been fully developed, or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled.  See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985); Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980).

Here, Plaintiff argues the ALJ's decision was not supported by substantial evidence and thus the Court should "remand this case for further administrative proceedings." (J. Mot. at 38.)  Defendant asks the Court to affirm the Commissioner's final decision.  (Id.)  The Court finds that remand is warranted because additional administrative proceedings could remedy the defects in the ALJ's decision.  Specifically, the Court **RECOMMENDS** that, upon remand, the ALJ: (1) reevaluate Plaintiff's allegations of pain and physical dysfunction and specifically identify which portions of it, if any, the ALJ finds not credible and why; (2) consider Plaintiff's ulcerative colitis and associated limitations when making the RFC determination; and (3) conduct a new sequential analysis considering the above and all of the evidence in the record.

For the foregoing reasons, the Court **RECOMMENDS** that Judgment be entered **REVERSING** the decision of the Commissioner and **REMANDING** this matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

/ / /

**IT IS ORDERED** that no later than __September 6, 2023__, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than __September 13, 2023__. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: August 25, 2023

Honorable Michael S. Berg
United States Magistrate Judge

22cv695-DMS (MSB)